812 F.2d 1407
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Carlos MARCANO, Plaintiff-Appellant,
v.
SECRETARY OF HEALTH AND HUMAN SERVICES, Defendant-Appellee.
 No. 85-1734.
 United States Court of Appeals, Sixth Circuit.
 Jan. 5, 1987.
 
 Before MILBURN and BOGGS, Circuit Judges, and EDWARDS, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Plaintiff-appellant, Carlos A. Marcano, appeals to this court from a district court decision, affirming the Secretary of Health and Human Services' denial of his application for social security disability and supplemental security income benefits. For the reasons hereinafter stated, we affirm.
 
 I.
 
 2
 Marcano was thirty-seven years old when he applied for social security benefits on January 4, 1983. He had a fifth grade education in his native Puerto Rico and had been an agricultural laborer and worked in a meat packing plant. He contends on appeal that injuries to his lower back prevent him from engaging in work activities.
 
 
 3
 On February 18, 1980, Marcano fell from a scaffolding at work and suffered contusions and sprains of the left wrist and cervical and dorsal spines. He was treated at an emergency room and released from the hospital two days later by his physician, Dr. Ira. He returned to work on February 25, 1981. He was examined by Dr. Plagenhoef on March 19, 1981, for swelling of the right hand. Medicine prescribed by Dr. Plagenhoef reduced the swelling only partially. Marcano's lower back discomfort increased significantly thereafter and, he alleges, interfered with work and normal living. He quit work at the meat packing plant on October 6, 1981, when he alleges that he became disabled.
 
 
 4
 On February 24, 1982, appellant was examined by Dr. Schwadere, an orthopedic surgeon, who found evidence of moderate tenderness and muscle spasm in his lumbar spine region. His range of motion was fair to good. His overall health was considered good. When Marcano had not improved, he was examined by Dr. Herringa, an orthopedic surgeon. On March 29, 1982, Dr. Herringa confirmed the finding of Dr. Schwadere, and found also that Marcano walked with a limp and had pain in the posterolateral aspect of the leg. He also found pain upon straight leg raising. Marcano was referred to Dr. Gracias, a neurosurgery specialist in back surgery, for further treatment.
 
 
 5
 On May 3, 1982, Dr. Gracias's neurological examination revealed some difficulty in walking and tiptoeing because of pain. Marcano was admitted to the hospital for a myelogram and an electromyelogram and nerve conduction test. These tests revealed a probable disc herniation between the L4 and L5 vertebrae, and a possible disc herniation between the L5 vertebra and the sacrum. Dr. Novarro, the attending radiologist, and Dr. Gracias attempted conservative treatment in the hospital, including bedrest and traction. Marcano was discharged from the hospital on May 22, 1982, with instructions to continue conservative treatment at home. When his condition had not improved at home, he requested Dr. Gracias to perform surgery. A second opinion was obtained before surgery from Dr. Kidwai, another neurosurgeon in practice with Dr. Gracias. Marcano was readmitted to the hospital for a computer-assisted tomography reading (CAT scan) and another myelogram. The results showed a probable herniated intervertebral disc. Dr. Gracias performed a laminectomy on November 24, 1982, and excised the herniated nucleus pulposis from the disc. Marcano was discharged in satisfactory condition on the fourth day following surgery, with Dr. Kidwai's post-operative report showing improvement.
 
 
 6
 On December 27, 1982, Marcano had his first post-operative examination with Dr. Schnaubel, an orthopedic surgeon. Dr. Schnaubel found that Marcano was totally disabled resulting from post-operative lumbosacral spine and residual bilateral lumbar myositis, low lumbar spinal stenosis, right sciatic neuritis and right great trochanteric bursitis. He found no injury to the neck or wrist resulting from the fall at work. Marcano saw Dr. Gracias on January 3, 1983, a day before he filed this application. Dr. Gracias found marked relief in spasms and diminished pain, although some pain upon straight leg raising persisted. Dr. Gracias felt that he should wait before returning to work. On February 20, 1983, during a visit to Dr. Gracias's office, Marcano reported that he reinjured his back in a fall on the ice. Considering that this accident delayed his schedule of recovery from the operation, Dr. Gracias stated that he was still disabled.
 
 
 7
 Dr. Herz, a neurosurgeon, examined Marcano at the request of his attorney on March 28, 1983. Dr. Herz stated that Marcano was not disabled. There was residual radiculopathy, and a lump in the right leg, with forward bending within the normal range of 50% flexibility. Dr. Herz felt that appellant could return to work with a sit or stand option, and with limitations on bending, twisting and lifting because of complaints. Because of a possible nonorganic component to his pain, Marcano was referred to a psychiatrist.
 
 
 8
 Marcano then visited a number of orthopedic and neurological physicians whose opinions conflict with that of Dr. Herz and one another. On April 6, 1983, Dr. Kingsley found that Marcano was unable to resume work, based on pain during straight leg raising and Spurling's test. On June 14, 1983, Dr. Gracias thought that Marcano could not return to work because of a bizarre sensory level and pain. Marcano was seen on June 22, 1983 by Dr. Andre, an orthopedic surgeon, who reported pain on straight leg raising and weakness in the flexors and extensors of Marcano's lower extremities, stiffness and pain, continued radiculopathy and stenosis. After an examination in November 1983, Dr. Gracias reported no pain on straight leg raising.
 
 
 9
 Marcano had two psychiatric evaluations, one by Dr. Ojeda, a Spanish-speaking psychatrist, on April 20 and April 28, 1983, and one by Dr. Klarman on May 19, 1983. Dr. Klarman reported that Marcano had no trouble understanding English. He used an interpreter, whom he considered quite professional. Dr. Ojeda administered a Cornell Medical Health Questionnaire and the Minnesota Multiphasic Personality Inventory ("MMPI") in addition to the clinical examination. Based on these tests, Dr. Ojeda found that the appellant was depressed and his ego functions were affected by the accident. Although there were neither hallucinations nor delusions, he was "more troubled than he appeared to be." He was "socially inadequate and has isolated himself." The doctor diagnosed atypical depression.
 
 
 10
 Dr. Klarman found that the MMPI was not credible because appellant admitted to him that he had considerable difficulty reading it. Dr. Klarman's diagnosis was one of mere unhappiness with life and the hardships of the operation and unemployment. He said that "Marcano confronts a situational problem--nothing more, nothing less." At the very most he was expressing a "sense of discontent and unhappiness that is part of an expected pattern."
 
 
 11
 An IQ test, the Wechsler Adult Intelligence Scale, showed scores of 58 through 62, but the psychologist and test administrator, Dr. Don Van Ostenberg, reported that the results might not have been reliable because the interpreter, appellant's sister, commented to him prior to the evaluation "that it was best not to do too well or know very much then you can get Social Security." This report was introduced at the hearing and incorporated into the exhibits to the record.
 
 
 12
 At a hearing before the administrative law judge, Marcano testified that he had problems standing for more than five minutes at a time without crutches, or sitting for more than fifteen minutes at a time without getting up. He stated that he experienced a great deal of pain in the back and attendant paralysis of the right leg. He stated that he occasionally prepared coffee and washed dishes but was unable to do any other work around the house, and could not drive an automobile because of the pain.
 
 
 13
 The ALJ issued a decision allowing benefits for the period from October 6, 1981 to March 23, 1983, and denied Marcano's disability claim beyond that time. The ALJ found that appellant's complaints of subjective pain were not based on the medical evidence. He discounted the IQ test results because of Marcano's reports to the psychiatrists of his ability to maintain his own apartment, cook meals, visit with friends, and the test administrator's report of the sister's remarks. The ALJ found that there was substantial evidence to support the conclusion that Marcano had no psychiatric difficulties, because Dr. Klarman's report was corroborated by the appellant's own reports of adjustment to a new lifestyle. The ALJ further found that the appellant was not engaging in substantial gainful activity and could not return to his past relevant work. The ALJ concluded that Marcano's residual functional capacity from his exertional impairments, which were severe, limited him to sedentary work. Applying Rule 201.18 of Appendix 2, subpart P of the Secretary's regulations, the ALJ ruled that Marcano was not disabled. That is, because Marcano is capable of sedentary work, is a man of limited education who is illiterate in English but is able to understand it, and was a young individual at the onset of disability, the grid directs a finding of not disabled.
 
 
 14
 The district court held that there was substantial evidence to support the ALJ's finding that Marcano was not disabled. On this appeal, appellant contends that the ALJ's decision was not supported by substantial evidence because: (1) there was no substantial evidence to support the findings that Marcano retained the residual functional capacity to perform sedentary work; (2) there was no substantial evidence to support the finding that appellant suffered no severe psychiatric impairment; and (3) the application of the grid was improper because appellant's nonexertional limitation due to pain was disregarded.
 
 II.
 
 15
 A determination that an individual is disabled shall be made "only if his physical or mental impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. Sec. 423(d)(2)(A) (1982). "The findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive...." 42 U.S.C. Sec. 405(g) (1982). Substantial evidence means more than a mere scintilla of evidence. There must be "such relevant evidence as a reasonable man might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). Our review for substantial evidence must be based upon the record as a whole. Harris v. Heckler, 756 F.2d 431, 435 (6th Cir.1985).
 
 
 16
 The Secretary's regulations dictate five steps in evaluating disability, which are: (1) claimant must not be doing substantial gainful activity; (2) he must have a severe mental or physical impairment; (3) if he has an impairment that meets the duration requirement and is listed in Appendix 1 to subpart P of the Regulations, or is equal to a listed impairment, the Secretary will find him disabled without consideration of steps 4 and 5; (4) he must not be capable of doing his past relevant work; and (5) considering his age, education, experience and residual functional capacity, there must not be significant number of jobs in the economy that the claimant can perform. 20 C.F.R. 404.1520 (1986). The Secretary does not dispute that Marcano is not now doing substantial gainful activity, or that he cannot do his past relevant work. Furthermore, with respect to the back injury at least, the Secretary does not dispute that Marcano's condition is a severe impairment. The dispute with respect to Marcano's back injury after March 28, 1983 concerns step 5 of the Secretary's regulations.
 
 
 17
 The ALJ concluded that Marcano was capable of doing sedentary work. "Sedentary work" involves lifting no more than ten pounds at a time, a certain amount of walking and standing, but primarily sitting. 20 CFR 404.1567(a) (1982). There is substantial evidence in the record that Marcano was capable of doing sedentary work. On March 28, 1983, Dr. Herz found that although Marcano had weakness in the extremities and stenosis, myopathy and radiculopathy of the spine, he had near normal reflexes, walked without a crutch, and had a normal range of motion in the back. He noted that Marcano's complaints were consistent with either numbness or pain. His report corroborated the findings of improvement from Dr. Kidwai following the operation. Furthermore a nerve test showed that conduction and function were near normal after the operation. Considering the medical evidence, there is substantial evidence for the administrative law judge's finding of a residual functional capacity to do sedentary work after March 23, 1983.[1]
 
 
 18
 The Secretary next must consider appellant's age, education, experience and residual functional capacity to determine whether there are jobs available to the appellant in the national economy that he can perform. 42 U.S.C. Sec. 423(d)(5) (1982). In this determination, the administrative law judge relied upon the grid. Marcano is a young individual with limited education, some ability to communicate in English, and a capacity to do sedentary work. Rule 201.18, subpart P, Appendix 2, directs a finding of not disabled. Because we have previously upheld the validity of the grid, we affirm the district court's and the administrative law judge's determinations that Marcano is not entitled to disability on account of the back injury. Salmi v. Secretary of Health and Human Services, 774 F.2d 685 (6th Cir.1985).
 
 
 19
 With respect to the alleged disability resulting from pain, the Secretary's regulations provide that mere allegations of pain cannot, ipso facto, be considered a disability. 20 C.F.R. 404.1529 (1986). Pain is merely another symptom to be considered to the extent that signs and laboratory functions confirms its severity. Ibid. With respect to pain, the administrative law judge's finding of the claimant's lack of credibility that is based on medical evidence in the record is conclusive. Harris, 756 F.2d at 436. Section 3(a)(1) of the Social Security Disability Benefits Reform Act of 1984, Pub.L. No. 98-460, codified at 42 U.S.C. Sec. 423(d)(5)(A) (Supp.III 1985) does not change this result.[2] The Senate Report states that the Act's standard for awarding disability benefits based upon the severe impairment of pain requires "objective medical evidence of pain or subjective complaints of pain that are reasonably expected to result from objective medical signs or symptoms." Senate Report No. 466, 98th Cong., 2d Sess. 24 (1984). The Senate Report indicates that this provision is merely intended to codify the case-by-case approach of the Secretary's regulations. Ibid.
 
 
 20
 The results of the MMPI Test are not objective evidence of pain in this case, because Dr. Klarman noted that Marcano had difficulty reading the test. That is understandable because the MMPI is designed for people literate in English. Furthermore, Marcano's results were consistent with the conscious repression of pain, rather than with another severe impairment.[3]
 
 
 21
 With respect to the alleged nonexertional limitations, we do not consider pain alone to be a nonexertional limitation that defeats the application of the grid. Kirk v. Secretary of Health and Human Services, 667 F.2d 524, 538 (6th Cir.1981), cert. denied 461 U.S. 957 (1981). A nonexertional limitation must be severe enough to restrict a full range of gainful employment at the designated level. Kirk, 667 F.2d at 537. Here, the administrative law judge specifically found that Marcano's allegations of pain were not credible, and that he is capable of sedentary activities.
 
 
 22
 Marcano's other alleged impairments are not severe. Marcano's claim that his scores ranging from 58 through 62 on the WAIS indicates that he is disabled because of either mental retardation must also be rejected. The ALJ found that the test administrator's report of the sister's remarks was credible and that appellant intentionally failed to achieve his true score on the IQ test. As to Marcano's emotional behavior, the MMPI scores that were reported were in sharp contrast to the appellant's own reports of enjoying the company of visitors, watching television and playing competitive games with others and maintaining his apartment. The test results can be ignored because they are inconsistent with appellant's behavior, which negates the application of Rule 12.05, Appendix 1, subpart P. Popp v. Heckler, 779 F.2d 1497 (11th Cir.1986). Furthermore, both psychiatrists found that Marcano is in touch with reality and is fully oriented. On this record there is no "emotional disorder" under Rule 12.04, Appendix 1, subpart P. Mere anxiety or neurosis is not a severe impairment for the purpose of the Social Security Act. Alvarado v. Weinberger, 511 F.2d 1046, 1049 (1st Cir.1975).
 
 
 23
 Accordingly, the decision of the District Court is affirmed.
 
 
 24
 EDWARDS, dissenting.
 
 
 25
 This social security claimant is a Puerto Rican who speaks only Spanish and has completed only the fifth grade. His prior work experience has been that of a butcher's assistant and an agricultural worker. He is of low intelligence--a psychiatrist, Dr. Klarman, estimated his I.Q. to be at about 80 after examining the plaintiff through an interpreter. In relation to his application, the Administrative Law Judge issued a decision awarding Marcano disability benefits beginning in October 1981 and terminating March 23, 1983 and denying them thereafter. The District Court, however, reversed the ALJ and entered judgment denying benefits.
 
 
 26
 Claimant had injured his back in a fall at work and while he returned to work after two weeks, he continued to experience pain which occasioned his quitting work October 6, 1980. After consultation with two orthopedic surgeons, he has not worked since that date.
 
 
 27
 Claimant had a laminectomy performed on the lumbar disc located at L4-5. This operation was performed on November 24, 1982 by a Dr. Kidwai. In March 1983, claimant was examined by Dr. D. Herz, a neurosurgeon who found that claimant could bend forward 50% of normal range and that straight leg raising was positive at 80 degrees. Dr. Herz concluded that claimant had residual lumbar radiculopathy at L4 and 5 as well as residual degenerative lumbar disc disease. Dr. Herz also found a nonorganic component of claimant's pain and suggested psychological evaluation. He stated "the prognosis for complete recovery here is hopeless. I believe he will complain of pain for an undetermined future."
 
 
 28
 In April 1983, claimant was examined by Dr. Ojeda, a psychiatrist, who concluded that Mr. Marcano was suffering from "atypical depression." Dr. Ojeda said:
 
 
 29
 "This is a man that is more troubled than he appeared to be, psychologically speaking. He has felt socially inadequate and has isolated himself and, therefore, is quite withdrawn. He is also depressed. His mood is very, very depressed and more than he is willing to admit. Upon further inquiry, I found that he has seriously entertained suicide but he said he has not carried out these ideas and impulses because " 'he still harbors hopes of getting better, someday.' " I did detect much hopelessness and despair, however, as he enumerated the facts that he had no money, no job and is sick and, as time goes on, the chances of returning to work seem to be less and less. Undoubtedly, Mr. Marcano feels quite diminished as a person. He has no insight into his serious predicament."
 
 Dr. Ojeda concluded:
 
 30
 "... I would like to offer the diagnosis of atypical depression, (severe). I found Mr. Marcano to be in a very precarious emotional condition. To this examiner, it is almost a miracle that this man has not gone psychotic and that still remains a possibility. He is potentially suicidal and he has been seriously impacted, obviously more so than he realizes, by the accident in which he injured his lower back while working at Murco Corporation. All this has become more serious due to the fact of his low sophistication, low socio-economic status and his total lack of understanding of what is going on.
 
 
 31
 I cannot be emphatic enough to impress upon you the fact that this man needs immediate psychiatric intervention before psychological defenses collapse completely. He has a definite physical impairment, which is quite obvious and has been well documented by other physicians. He is not ready to return to work. Psychologically speaking, he is going to need a year or two of intensive treatment for his depression."
 
 
 32
 Deposition of Dr. Ojeda, Joint Appendix at 180-181, 182-183.
 
 
 33
 While I recognize that there is some medical evidence which would support the view that claimant could perform some sedentary work, I nonetheless would reverse and grant benefits. In this regard, I rely on 20 C.F.R. Part 404, Subpart P, Appendix 2, Sec. 201.00(h) (example 2) which reads:
 
 
 34
 "An illiterate 41 year old individual with mild mental retardation (I.Q. of 78) is restricted to unskilled sedentary work and cannot perform vocationally relevant past work, which had consisted of unskilled agricultural field work; his or her particular characteristics do not specifically meet any of the rules in Appendix II, because this individual cannot perform the full range of work defined as sedentary. In light of the adverse factors which further narrow the range of sedentary work for which this individual is qualified, a finding of disabled is appropriate."
 
 
 
 [1]
 There is a five-day difference between Dr. Herz's examination and the administrative law judge's finding of residual functional capacity. The ALJ may have read this examination as having been on March 23, not March 28. Although there is no evidence in this record that any doctor found Marcano able to do work on March 23, since benefits are paid on a monthly basis, there is no difference in the result
 
 
 [2]
 Section 3(a)(1) states: "An individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability as defined in this section; there must be medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, which show the existence of a medical impairment that results from anatomical, physiological, or psychological abnormalities which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all evidence required to be furnished under this paragraph (including statements of the individual or his physician as to the intensity and persistence of such pain or other symptoms which may reasonably be accepted as consistent with the medical signs and findings), would lead to a conclusion that the individual is under a disability. Objective medical evidence of pain or other symptoms established by medically acceptable clinical or other laboratory techniques (for example, deteriorating nerve or muscle tissue) must be considered in reaching a conclusion as to whether the individual is under a disability." This section applies only to determinations before January 1, 1987
 
 
 [3]
 J.C. McGill, G.F. Lawlis, D. Selby, V. Mooney, C.E. McCoy, The Relationship of Minnesota Multiphasic Personality Inventory Profile Clusters to Pain, 6 Journal of Behavioral Medicine 77, 90 (1983); see also 20 C.F.R. 404.1523 (1986) (concurrent impairments)